**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| SEARS AUTHORIZED HOMETOWN STORES, LLC, *et al.*,[1] | Case No. 22-11303 (Jointly Administered) |
| Debtors. | Hon. Brendan L. Shannon |
| JEOFFREY L. BURTCH, NOT INDIVIDUALLY BUT AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF SEARS AUTHORIZED HOMETOWN STORES, LLC, et al., | |
| Plaintiff, | |
| v. | Adv. No. _____ |
| ESL INVESTMENTS, INC., ESL PARTNERS, L.P., HOMETOWN MIDCO LLC, HOFFMAN TOPCO LLC, TRANSFORM HOLDCO LLC, TRANSFORM MIDCO LLC, TRANSFORM SR ACCEPTANCE LLC, TRANSFORM SR LLC, TRANSFORM SR HOLDINGS LLC, TRANSFORM SR HOLDING MANAGEMENT LLC, TRANSFORM KM LLC, TRANSFORM SR BRANDS MANAGEMENT LLC, TRANSFORM SR BRANDS LLC, TRANSFORM HOLDINGS, INC., EDWARD S. LAMPERT, ELISSA ROBERTSON, HENRY BASRA AND MAHAD RAFEEQ, | |
| Defendants. | |

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are the following: Sears Authorized Hometown Stores, LLC (9641); and Sears Hometown Stores, Inc. (8358). The Debtors' mailing address is 5500 Trillium Blvd. Suite 501, Hoffman Estates, IL 60192.

74144707\10

**COMPLAINT**

Plaintiff, Jeoffrey L. Burtch, chapter 7 trustee (the "Trustee") for the above-captioned bankruptcy estates (the "Estates") of the Sears Hometown Stores, Inc. ("SHS") and Sears Authorized Hometown Stores, Inc. ("SAHS," and together with SHS, the "Debtors"), by his undersigned attorneys, files this complaint (the "Complaint") against ESL Investments, Inc., ESL Partners, L.P., Hometown Midco LLC, Hoffman Topco LLC, Transform Holdco LLC, Transform Midco LLC, Transform SR Acceptance LLC, Transform SR LLC, Transform SR Holdings LLC, Transform SR Holding Management LLC, Transform KM LLC, Transform SR Brands Management LLC, Transform SR Brands LLC, Transform Holdings, Inc., Edward S. Lampert, Elissa Robertson, Henry Basra and Mahad Rafeeq (collectively, the "Defendants"), and in support thereof hereby alleges as follows:

**NATURE OF THE ACTION**

1. The Trustee seeks entry of a judgment determining that the Transform Defendants (as defined herein) are the alter ego of the Debtors and thus liable for the Debtors' corporate liabilities, and substantively consolidating the assets and liabilities of the Estates with those of the Transform Defendants.

2. In the alternative, the Trustee seeks entry of a judgment avoiding and recovering the value of the One-Year Transfers from the Transform Contract Parties, Transform Midco and Transform Holdco (as such terms are defined herein) in the amount of $177,763,701.05 pursuant to 11 U.S.C. §§ 544, 547, 548, and 550 and applicable state law, including without limitation Del. Code tit. 6 § 1305.

3. In addition, the Trustee seeks entry of a judgment disallowing, pursuant to 11 U.S.C. § 502(d) and (j), any and all claims that the Transform Contract Parties have filed or asserted against the Estates.

74144707\10

4.      In addition, the Trustee seeks entry of a judgment recharacterizing as equity any and all claims of the Transform Contract Parties, to the extent such claims are allowed.

5.      Finally, the Trustee seeks entry of a judgment for damages resulting from breaches of fiduciary duty owed to the Debtors by the Fiduciary Defendants (as defined herein).

## **JURISDICTION AND VENUE**

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises under and in, and is related to, cases under title 11 of the United States Code (the "Bankruptcy Code"), styled as *In re: Sears Authorized Hometown Stores, LLC, et al.*, pending before the Court as Case No. 22-11303 (BLS) (jointly administered) (the "Bankruptcy Cases").

7.      Counts II, III, IV, V, VI, VII, VIII, and IX of this Complaint are "core" matters and may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders and judgments related to matters arising therein.

8.      Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Trustee consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Bankruptcy Cases are pending in the District of Delaware.

74144707\10

10.     Personal jurisdiction over the Defendants exists in this Court because Defendants conducted business in the United States, directed activities toward the Debtors in the United States, and/or the transfers at issue occurred in the United States.

**PARTIES**

A.  **The Defendants**

11.     ESL Investments, Inc. ("ESLI") is a corporation formed in the State of Delaware.

12.     ESL Partners, L.P. ("ESLP") is a limited partnership registered in the State of Delaware.

13.     Edward S. Lampert is an individual who, upon information and belief, is a resident of the State of Florida.

14.     Hometown Midco LLC ("Hometown Midco") is a limited liability company formed in the State of Delaware.

15.     Hoffman Topco LLC ("Hoffman Topco," and together with the Transform Parties (as defined below), the "Transform Defendants") is a limited liability company formed in the State of Delaware.

16.     Transform Holdings, Inc. ("Transform Holdings") is a corporation formed in the State of Delaware.

17.     Transform Holdco LLC ("Transform Holdco") is a limited liability company formed in the State of Delaware.

18.     Transform Midco LLC ("Transform Midco") is a limited liability company formed in the State of Delaware.

19.     Transform SR Acceptance LLC ("Transform Acceptance") is a limited liability company formed in the State of Delaware.

4

20. Transform SR LLC ("Transform SR") is a limited liability company formed in the State of Delaware.

21. Transform SR Holdings LLC ("Transform SR Holdings") is a limited liability company formed in the State of Delaware.

22. Transform SR Holding Management LLC ("Transform SR Holding Management") is a limited liability company formed in the State of Delaware.

23. Transform KM LLC ("Transform KM," and together with Transform Acceptance, Transform SR, Transform SR Holdings, Transform SR Holding Management, the "Transform Contract Parties") is a limited liability company formed in the State of Delaware

24. Transform SR Brands Management LLC ("Transform SR Brands") is a limited liability company formed in the State of Delaware.

25. Transform SR Brands LLC ("Transform Brands") is a limited liability formed in the State of Delaware.

26. The term "Transform Defendants" as used herein refers to ESLP, ESLI, Hometown Midco, Hoffman Topco, Transform Holdings, Transform Holdco, Transform Midco, the Transform Contract Parties, Transform SR Brands and Transform Brands.

27. The term "Transform" as used herein refers to Transform Holdings, Transform Holdco, Transform Midco, the Transform Contract Parties, Transform SR Brands and Transform Brands.

28. Elissa Robertson is an individual who, upon information and belief, is a resident of the State of Massachusetts.

29. Henry Basra is an individual who, upon information and belief, is a resident of the State of Illinois.

5

30.     Mahad Rafeeq (together with Mr. Lampert, Ms. Robertson, and Mr. Basra, the "Fiduciary Defendants") is an individual who, upon information and belief, is a resident of the State of Illinois.

**B. Ownership Structure of the Defendants**

31.     On information and belief, all of the Transform entities are wholly owned subsidiaries of Hoffman Topco.

32.     On information and belief, Hometown Midco is a wholly owned subsidiary of Hoffman Topco.

33.     On information and belief, as of the Petition Date, the outstanding shares of Debtor Sears Hometown Stores, Inc. were owned by Hometown Midco (approx. 45%), ESLP (approx. 8%), Mr. Lampert (approx. 38%), and other limited partnerships (approx. 9%).

34.     On information and belief, ESLP owns 80% of the equity interests in Hoffman Topco.

35.     On information and belief, ESLI is owned and controlled by Mr. Lampert.

36.     On information and belief, ESLP is owned and controlled by Mr. Lampert.

## BACKGROUND

**A. Appointment of the Trustee**

37.     On December 12, 2022 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Bankruptcy Cases.

38.     On February 22, 2023, the Court entered orders converting the Bankruptcy Cases to chapter 7 of the Bankruptcy Code (the "Conversion Orders"), effective as of that date.

6

74144707\10

39.    The Trustee was appointed as interim trustee for each Estate shortly after the Court entered the Conversion Orders.

40.    The section 341 meeting of creditors was held and concluded on March 23, 2023 without a trustee being elected.  Accordingly, the Trustee now serves pursuant to section 702(d) of the Bankruptcy Code.

**B.  The Debtors' Business Model**

41.    Until 2019, the Debtors had two primary business segments: the "Sears Hometown" stores and the "Outlet" stores.

### i.    *Sears Hometown Segment*

42.    The Sears Hometown segment sold appliances, hardware, tools, and lawn and garden equipment.  In contrast to the larger department stores owned by Sears Holdings Corporation ("Sears Holdings"), the Sears Hometown stores were smaller retail locations operated by a network of independently-owned dealers (the "Dealers").  The Sears Hometown stores stocked Sears sub-brands Kenmore, Diehard and Craftsman, and were almost entirely reliant on, and captive to, Sears Holdings (and later, the Transform Defendants) for providing inventory.

43.    Under the dealer model, the Debtors provided inventory (on a consignment basis), branding and marketing to the Dealers.  The Dealers were responsible for start-up costs, lease payments and other store operating costs, including payroll.  The Dealers received cash commissions based on their net sales of merchandise and extended-service plans (the "Dealer Commissions").

44.    Each Dealer had an agreement with SAHS pursuant to which SAHS owed the Dealer Commissions to the Dealers.  SHS was not a party to the Dealer Agreements.

45.     At the Debtors' peak, over 1,100 Sears Hometown stores were operating across North America.  By the Petition Date, however, only approximately 121 Sears Hometown stores remained across 26 states and in Puerto Rico.

46.     The remaining Sears Hometown stores ceased all operations as of the conversion of the Bankruptcy Cases.

### ii.     Outlet Segment

47.     The Outlet segment sold primarily scratched-and-dented and refurbished appliances.  Like Hometown, the Outlet retail locations were independently owned and operated. But unlike Hometown, the Outlet segment sourced most of its inventory from manufacturers other than Sears Holdings and served as a liquidation channel for major appliance vendors.  As discussed below, the Debtors sold the Outlet segment in 2019.

### C. In 2012, Sears Holdings spins-off the Debtors, and Mr. Lampert obtains a controlling stake.

48.     On information and belief, Mr. Lampert served as the Chairman of the Board of Directors of Sears Holdings beginning in 2005, as well as Sears Holdings' Chief Executive Officer beginning in 2013.

49.     Mr. Lampert also served as the Chairman and Chief Executive Officer of ESLI and ESLP since their founding.

50.     On information and belief, as of September 28, 2018, approximately 49% of the outstanding shares of Sears Holdings were held by Mr. Lampert and Lampert-controlled entities, including ESLI.

51.     Prior to 2012, Sears Holdings owned SHS and its wholly owned subsidiaries, SAHS and Sears Outlet Stores L.L.C. ("Sears Outlet").

8

52. In 2012, Sears Holdings spun off SHS together with its subsidiaries, and SHS became a publicly owned company (the "Spin-off").  After the Spin-off, SHS continued to wholly own SAHS and Sears Outlet.

53. Mr. Lampert, through his affiliated entities, obtained a majority stake in the common stock of SHS of approximately 54%.

**D. The Debtors enter into Transition Agreements to facilitate their transition to independent companies.**

54. At the time of the Spin-off, the Debtors and Sears Holdings entered into a series of agreements (collectively, the "Transition Agreements") to facilitate the transition of the Debtors to a separate and independently owned and operated company.

55. The Transition Agreements included the following contracts: (i) the Merchandising Agreement, dated July 28, 2012 (as subsequently amended and restated, the ("Merchandising Agreement"), and (ii) the Services Agreement, dated August 8, 2012 (as subsequently amended, the "Services Agreement").

### i. The Merchandising Agreement

56. The Merchandising Agreement permitted the Debtors to purchase from Sears Holdings (and later, the Transform Defendants) inventory for the Sears Hometown and Outlet stores, including appliances, sporting goods, furniture and other items.

57. Under the Merchandising Agreement, the Debtors purchased from the "Seller" (defined in the Merchandising Agreement as Sears, Roebuck & Co. and Kmart Corporation) products that the Seller would purchase from third-party vendors at cost, net of certain charges and credits.  The Debtors also owed the Seller royalties in connection with the Debtors' sales of certain Sears sub-branded products (*i.e.,* Kenmore, Craftsman, and Diehard branded products ("KCD Products")) to consumers.

9

58. Under the terms of the Merchandising Agreement, upon the Seller's delivery of inventory to the "FOB Point" (*e.g.,* a Sears Hometown store, the residence of a customer of a Sears Hometown store, or a distribution facility in accordance with the Debtors' instructions), the Seller would invoice the Debtors for the Inventory.

59. All inventory would remain in the Seller's custody and control until it was either (i) transferred to a Dealer at the Debtors' direction, (ii) sold by the Debtors directly to a consumer, or (iii) as discussed further below, sold by the Transform Defendants directly to a consumer.

60. Inventory that was purchased and paid for by the Debtors could be sold by the Transform Defendants, with a corresponding credit issued to the Debtors issued pursuant to the Weekly Invoice System.

61. The Debtors received commissions from the Seller for specified sales of merchandise on www.sears.com, the sale of extended-service plans, delivery and handling services and the use of Sears-branded credit cards in the Debtors' stores.

62. The amounts that the Debtors owed to the Seller under the Merchandising Agreement were non-interest-bearing, settled on a net basis, and had payment terms of ten (10) days after the invoice date pursuant to the Weekly Invoice System (as discussed further below).

### ii. The Services Agreement

63. Under the Services Agreement, the Debtors were reliant on Sears Holdings for a wide panoply of back-office services, including, among other things, payroll, treasury management, benefits administration, accounts payable processing, vendor negotiations, treasury management, financial accounting, information technology services, inventory tracking and reporting, tax reporting, risk management and insurance, marketing services, point-of-purchase

technology and administration, credit card processing, gift card administration, product safety, store planning, and logistics support.

64.    The Services Agreement set out different payment schedules for different types of services, as a result of which the Debtors were obligated to pay Sears Holdings (and later, the Transform Defendants) though a mix of annual, quarterly, monthly and hourly fees.

65.    Amounts due to Transform under the Services Agreement are non-interest-bearing, settled on a net basis, and have payment terms of ten (10) days after the invoice date.

66.    On information and belief, the initial term of the Transition Agreements was sixty-six (66) months, or through approximately February 2018.

**E. Mr. Lampert and Transform Holdco purchase Sears Holdings (and the Transition Agreements) out of bankruptcy.**

67.    Following the Spin-off, SHS reported net losses of:  $168 million (fiscal year ending January 31, 2015), $27 million (fiscal year ending January 31, 2016), $131 million (fiscal year ending January 28, 2017), and $95 million (fiscal year ending Feb. 3, 2018).

68.    By October 2018, SHS had closed more than half of its Sears Hometown stores.

69.    On October 15, 2018, Sears Holdings and its affiliated entities filed petitions under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York (the "Holdings Bankruptcy Cases").

70.    On February 11, 2019, Transform Holdco purchased most of Sears Holdings' operating assets through a sale process in the Holdings Bankruptcy Cases.

71.    In connection with the purchase, certain of the Transform Defendants took assignment of the Transition Agreements, with (i) Transform SR Holding Management taking assignment of the Services Agreement, and (ii) Transform SR, Transform KM, and Transform SR Holdings taking assignment of the Merchandising Agreement.

11

**F. Transform prevents the liquidation of the unprofitable Sears Hometown segment, merges with the Debtors, and sells the profitable Outlet segment.**

72.    In 2018 and early 2019, SHS continued its decline, posting a net loss of $53 million for fiscal year ending February 2, 2019.

73.    The losses for that period were attributable to the Hometown Stores segment.   In sharp contrast, the Outlet segment posted healthy profits.

74.    In early 2019, the SHS board of directors (the "SHS Board") began taking steps to close the remaining Sears Hometown stores and liquidate the Hometown Stores segment.

75.    Despite the unprofitability of the Hometown Stores segment, Mr. Lampert opposed its liquidation for at least 3 reasons:

    a.  Hometown Stores – unlike the Outlet segment – provided a substantial sales channel for the KCD Products.  Sears Hometown did not have the right to acquire the KCD Products from any party other than Transform.  The majority of the Hometown Stores' revenue was generated by sales of the KCD Products. Liquidating the Hometown Stores segment would have eliminated the KCD sales channel for the Transform Defendants.

    b.  The Transition Agreements provided hundreds of millions of dollars in yearly revenue to the Transform Defendants.  Liquidating the Hometown Stores segment would have eliminated that revenue stream.

    c.  Mr. Lampert and the Transform Defendants' long-term strategy for the Sears brand was to develop "smaller store" brick-and-mortar Sears locations.  Liquidating the Hometown Stores segment would have prevented Transform from capitalizing on the Hometown Stores' substantial geographic footprint.

74144707\10

76.     Accordingly, on April 15, 2019 Mr. Lampert acted through his affiliated entities to prevent the planned liquidation by removing two directors from the SHS Board, adding two directors to the SHS Board, and amending SHS's bylaws to make it more difficult to approve any "Liquidation Action."

77.     These actions prevented the SHS Board from executing its plan to liquidate the Hometown segment and, instead, set the company on an alternate track – one that would see it become acquired by the Transform Defendants and then, under Transform's ownership, sell off its profitable Outlet segment.

78.     The first step in this plan occurred when, on or about June 1, 2019, Transform Holdco and SHS entered into a merger agreement (the "Merger Agreement"), pursuant to which Transform Holdco purchased the outstanding shares of SHS not already owned by Lampert-related entities.

79.     The second step occurred on August 27, 2019, when SHS and a third party purchaser entered into an equity and asset purchase agreement for the sale of the Outlet segment (the "Outlet Sale").  On October 23, 2019, the Outlet Sale closed.  Immediately following the consummation of the Outlet Sale, pursuant to the terms of the Merger Agreement, Transform Merger Corporation ("Merger Sub") merged with and into SHS, with SHS as the surviving corporation (the "Merger").

80.     Immediately after the close of the Merger, Mr. Lampert, though his affiliated entities, owned 100% of SHS.

81.     When the Merger was later challenged in a lawsuit by SHS's minority stockholders, the Court of Chancery of Delaware (the "Chancery Court") found that Mr. Lampert – as a "self-dealing fiduciary" – had breached his fiduciary duty in connection with the Merger and found that

13

the Merger "as a whole was . . . unfair."  The Chancery Court awarded damages to the minority stockholders of $8,727,469.35.

82.    On information and belief, after the Merger, Transform Holdco transferred its shares in SHS to Hometown Midco, ESLP and Mr. Lampert.

83.    In connection with the Merger, on October 23, 2019, the Debtors entered into a credit agreement with PNC, as administrative agent and collateral agent (as amended, the "PNC Credit Agreement").  The PNC Credit Agreement provided for a senior secured revolving credit facility, initially in the amount of $80,000,000, secured by substantially all of the Debtors' assets.

**G. Having reunited the Debtors with Sears, Transform runs the Debtors' failing business as one more division of Sears/Transform.**

84.    Following the Merger, Transform issued a press release announcing that its acquisition of the remaining stock in the Debtors would "accelerate Transform's strategy of growing its smaller store format by adding Sears Hometown stores."

85.    According to the press release, the Merger would "also expand the company's footprint as a multi-channel business that can serve customers through a variety of shopping experiences to meet their needs, provide growth for Transform's marquee brands, including Kenmore® and DieHard®, and increase opportunities for Sears Home Services and Financial Services businesses, as well as the Shop Your Way® social shopping destination and rewards program."

86.    In the press release, then CEO of SHS, William Powell, stated his belief that "reuniting our Sears Hometown segment stores with Transform's Sears full-line stores will result in a more consistent customer experience across Sears branded storefronts, generate higher total revenues and leverage efficiencies of scale to improve costs and margins, all of which could lead to improved profitability for Sears Hometown's dealers and franchisees."

14

74144707\10

87.     Finally, with the business "under one roof," Mr. Lampert anticipated numerous "efficiencies of scale."

88.     SHS's public accountant was less optimistic about efficiencies of scale, at least as they applied to the Debtors.  According to the auditor, "costs and allocations charged to [SHS]" – on a weekly basis – "may not necessarily be indicative of the conditions that would have existed . . . if [SHS] had been operated as an unaffiliated company [of Transform] or if [SHS] itself was provided the applicable services."

89.     The auditor did not view the Debtors' complete and utter dependency on Transform as a positive.  "[SHS] depends on Transform for its key products and services.  Consequently, if Transform is unwilling, unable or otherwise fails to provide these key products and services, or if the Sears or Kenmore brands are impaired, the Company could be materially and adversely affected."

90.     In fact, the Transition Agreements limited the Debtors' performance, operations and ability to respond to market conditions and resulted in higher costs to the Debtors than what they would have otherwise obtained in the marketplace.

91.     Following the Debtors' merger with Transform, the Debtors continued to post net operating losses.

92.     At fiscal year-end occurring February 1, 2020, SHS reported a net operating loss of $41,987,000.

93.     At fiscal year-end occurring January 30, 2021, SHS reported a net operating loss of $10,687,000.

94.     At fiscal year-end occurring January 29, 2022, SHS reported a net operating loss of $18,669,000.

74144707\10

95. From the Merger through the Petition Date, Transform ran the Debtors as a single economic enterprise with itself, sharing not only overall strategy, branding, expenses, and IT infrastructure (among other items), but also key employees and officers.

> ### i. *Transform jettisons SHS's infrastructure, reincorporates the company into Transform's operations, and keeps it captive under the Transition Agreements.*

96. Following the Spinoff from Sears Holdings, beginning in 2017, the Debtors had embarked on an effort to break their reliance on Sears Holdings and migrate away from many of the services provided under the Transition Agreements. The Debtors spent tens of millions of dollars ($34.4 million and $25.9 million in 2017 and 2018, respectively) to establish their own information technology and enterprise resource planning infrastructure, separate from that of Sears Holdings (the "Independent ERP").

97. The Independent ERP would have allowed the Debtors to reduce their dependence on Sears Holdings (and later Transform), and negotiate in the marketplace for the services and infrastructure that was being provided by Sears Holdings and later Transform under the Transition Agreements. The Independent ERP would have allowed the Debtors to either perform these services themselves, or else bid them out to independent third-party vendors. The services to be replaced included tax, accounting, non-merchandise procurement, risk management and insurance, advertising and marketing, human resources, loss prevention, environmental, product and human safety, facilities, information technology, online, payment clearing, real estate management, merchandising, and other support services.

98. On information and belief, the Debtors had substantially completed the Independent ERP by 2019.

16

74144707\10

99.     However, in August of 2019, Mr. Lampert and the Transform Defendants compelled SHS to include the Independent ERP among the assets sold to the third party purchaser in the Outlet Sale.

100.    The sale of the Independent ERP forced the hamstrung Debtors to continue their reliance on the Transform Defendants for enterprise resource infrastructure and all manner of other vital services under the Services Agreement.

101.    Having gutted the infrastructure of an already financially struggling company, the Transform Defendants left the Debtors entirely dependent on Transform's infrastructure and subject to paying massive fees to the Transform Defendants under the Services Agreement. Indeed, following the Merger, the parties added yet more services to be provided by Transform for the Debtors under the Services Agreement.

102.    Transform caused the sale of the Independent ERP because the Merger was, in fact, a reincorporation of the Debtors as a division of Sears/Transform.

### ii.     *Transform runs the Debtors as a division of Transform, not as a separate company.*

103.    For all intents and purposes, the Debtors were Transform.  It is difficult to identify business activities and services that were <u>not</u> shared by the Debtors and Transform under the Transition Agreements.  The Transition Agreements (and the parties' course of dealing) provided for the sharing of services and infrastructure ranging from cash management systems to in-store music, and includes without limitation the following:

    a. <u>Accounting System</u>.  The Debtors and the Transform Defendants shared a single general ledger and accounting system to record all financial transactions by both the Transform Defendants and the Debtors.  Upon information and belief, accounting data was accumulated by Transform and the Debtors, and each could access the data, via location codes, to create entity specific general ledgers and financial reports.  The underlying system was maintained by Transform.  The Transform Defendants maintained reports on the Debtors' financial position,

74144707\10

processed journal entries on the general ledger, maintained the integrity of account balances, and reconciled the Debtors' monthly reconciliation of balance sheet accounts. The Transform Defendants prepared the Debtors' federal and state tax returns and remitted their taxes when due. All of the Debtors' financial and accounting transactions were recorded on software programs maintained and controlled by the Transform Defendants.

b.  IT Infrastructure. The Transform Defendants provided and maintained all of the Debtors' IT infrastructure, including the servers, network, software and help desk, and licensed domain names to the Debtors (including, without limitation, searshometownstores.com)

c.  Cash Management System. The Transform Defendants and the Debtors shared a single cash management system maintained and operated by the Transform Defendants, including cash clearing account, daily investment, cash forecast and cash flow services.

d.  Accounts Payable System. The Transform Defendants processed the Debtors' accounts payable, including approving invoices, corresponding with vendors, cutting checks, and processing disbursements.

e.  Treasury Services. All of the Debtors' bank accounts were incorporated into the Transform Defendants' treasury system, meaning the Debtors had no bank accounts that they independently controlled. Rather, the Debtors relied on the Transform Defendants to provide all treasury functions, including the establishment of banking structures, opening and maintaining new and existing bank accounts, performing daily consolidation of funds, moving cash, reconciling accounts, and developing funding forecasts.

f.  Marketing. The Transform Defendants were the Debtors marketing back-office, managing vendors, negotiating contracts, overseeing the placement of advertisements, and providing distribution analytics.

g.  eCommerce Services. The parties shared an integrated, online marketplace across the Debtors' websites, the Transform Defendants' websites, and online kiosks at their respective stores (the "Shared Marketplace"). On information and belief, the Shared Marketplace allowed customers to search for and purchase inventory from either the Debtors or the Transform Defendants, regardless of which website or store location the purchase originated, and customize delivery of the merchandise to their homes or to the store locations of either the Debtors or the Transform Defendants. A customer could thus order an appliance from the Transform Defendants while at a Sears Hometown store, and *vice verse*. Customers were not informed that they were purchasing from the Debtors when on a Sears website.

h.  HR Functions. The Transform Defendants administered the Debtors' employee payroll, benefits and savings plans. The Transform Defendants also provided employee commission support services, maintained a record of employee

74144707\10

compensation plans at each Sears Hometown store, and provided commission rate reporting and tracking.

i. <u>Inventory Management (and Inventory)</u>.   All of the Debtors' inventory was maintained at the Transform Defendants' warehouses.  The Debtors' inventory was only "virtually" segregated from that of Transform, and the Transform Defendants routinely sold the Debtors' inventory to their own customers with the Debtors receiving a corresponding credit.  Simultaneously, the Transform Defendants were also the <u>supplier</u> for the Debtors' Kenmore, Craftsman and Diehard-branded inventory, which made up the majority of the inventory sold by the Debtors. The Transform Defendants performed physical inventory process management, merchandise tracking technology, security management services, crisis and emergency management, safety management, and loss mitigation and resolution services.  The Transform Defendants were also in charge of negotiating with suppliers and purchasing the Debtors' inventory.

j. <u>Logistics</u>.   The Transform Defendants handled all logistics and inventory distribution for the Debtors.   They managed the overseas, truck and rail transportation of merchandise, oversaw freight forwarding, handled customs, filled and shipped orders from the Debtors' customers, and directed transportation of inventory from their warehouses to the Debtors' stores and customers.

k. <u>Insurance Administration</u>.   The Transform Defendants oversaw the Debtors' insurance programs, including claims review and tracking of workmen's comp, auto, general liability, property, and D&O insurance.

l. <u>Payment Processing</u>.  The Transform Defendants managed the Debtors' credit card payment processing systems as well as the gift card program, enabling Sears and Sears Hometown gift cards to be used at both the Debtors' and the Transform Defendants' stores.

m. <u>Promotions</u>.  The Transform Defendants provided coordinated promotions with the Debtors, including emailing customers from www.sears.com with promotions from Sears Hometown stores.

n. <u>Utility Management</u>.  The Transform Defendants provided utility management to the Debtors, including bill consolidation and payment services, rate monitoring, financial reporting, 13-month rolling budget development, and energy procurement services

104.    As a practical matter, if the Transform Defendants failed to perform under the Transition Agreements, the Debtors' operations would immediately cease.

74144707\10

105.    The Debtors paid hundreds of millions of the dollars to the Transform Defendants. To the extent that the payments were on account of the Transition Agreements, the Debtors were effectively financing the Transform Defendants' infrastructure.

106.    The Debtors and the Transform Defendants also shared officers and employees.

107.    On information and belief, prior to the Petition Date, the Debtors shared at least five (5) key employees and officers with the Transform Defendants, including James Coutre (Director of Business Analytics at Transform while he was Senior Director of Business Financing at the Debtors); Kevin Schwendeman (Director of Inventory Management at Transform while he was Director of Inventory Management at the Debtors); Elissa Robertson (Head of Retail for Transform while she was VP of Retail and CEO at the Debtors); Henry Basra (Head of Retail Finance at Transform while he was CFO of the Debtors); and Mahad Rafeeq (Vice President of Finance at Transform while he was CFO and/or Treasurer at SHS).

108.    Additionally, Mr. Lampert placed Transform employees on the SHS Board, including Elissa Robertson and Henry Basra.

109.    The bylaws of SHS, as amended after the Merger, required the appointment of a President, a Treasurer, and a Secretary.

110.    On information and belief, SHS never had a President.

111.    In fact, on information and belief, the Debtors did not have any executive-level officer until May 2022, when Mr. Lampert and ESLP appointed Ms. Robertson as CEO, just months before the Petition Date.

112.    On information and belief, the bylaws did not provide for the appointment of a CEO.

20

113.    The Debtors did not have their own IT system, but rather relied entirely on the servers and platforms maintained by Transform.

114.    The Debtors had no independent set of books and records.  All of the Debtors' books and records were maintained by the Transform Defendants on systems maintained by Transform.

115.    The Debtors did not have their own general ledger.  Rather, Transform maintained just a single general ledger for the company, meaning that the Debtors' financial transactions were maintained on the same ledger as the transactions of the other Transform businesses.

116.    On information and belief, Transform had the ability to control the Debtors' bank accounts, and was able to direct the bank to transfer money from those accounts.

117.    The Debtors did not have their own purchase orders.  Rather, the Debtors used purchase orders with Transform's name, which the Debtors would issue to vendors.  On information and belief, the purchase orders contained no indication that they were actually for the Debtors, and, by all appearances, looked as if they had been issued by Transform for purchases for Transform.

118.    On information and belief, the Debtors did not pay their vendors.  Rather, the Debtors would input invoices from vendors (the "SHS Accounts Payable") into Transform's accounts payable system for a particular week.  The following Friday, Transform would issue an invoice to the Debtors (the "Weekly Invoice") that included the aggregate amount of the SHS Accounts Payable for that week, as well as a series of other charges and credits (discussed below) incurred during the period.  The following Tuesday, SHS would make a single payment to Transform on the Weekly Invoice, 10 days after the relevant week.  After receiving payment on the Weekly Invoice from SHS, Transform would pay SHS's vendors and other creditors from its

21

own accounts by check or ACH transfer. On information and belief, the "payor" on these checks was Transform, and not the Debtors. Thus, by all appearances, it was *Transform* paying the Debtors' vendors, and not the Debtors. Moreover, if a Transform entity happened to owe money to a particular creditor of the Debtors, Transform would often make a single payment on behalf of both the Debtors and Transform. In such instances, from the vendor's perspective, the "SHS" portion of the payment would have been indistinguishable from the "Transform" portion.

119.   This arrangement meant that the Debtors could not take advantage of whatever credit terms their vendors may have offered. Rather, upon their receipt of an invoice, the Debtors would input the information into Transform's system, receive the Weekly Invoice from Transform on the following Friday, and then make a single bulk net payment to Transform by the following Tuesday (although, as described below, in practice, as its finances deteriorated, SHS short-paid Transform, and/or was late in paying Transform). Thus, no matter the payment terms offered by the vendor, Transform compelled the Debtors to effectively pay all invoices, at the latest, within 10 days of receipt.

120.   This system allowed Transform to take advantage of the float, to the Debtors' detriment. Transform would receive payment from SHS on a particular invoice (at most) 10 days after the invoice was received by SHS. Transform would then hold payment until the precise due date, thus capturing for itself the benefit of the vendor's credit terms.

121.   The arrangement extended to the purchases of inventory, notwithstanding the terms of the Merchandising Agreement which only required payment when goods were delivered to a Dealer or sold to a customer. For inventory that the Transform Defendants did not already have in their warehouses that the Debtors sought to purchase, the Transform Defendants would order

22

the inventory from the vendor and immediately invoice the Debtors pursuant to the Weekly Invoice System.

122.    Not only did this system allow Transform to expropriate the credit terms offered by the Debtors' vendors, but it also allowed Transform to stock inventory at no cost to itself. Transform maintained all of the Debtors' inventory at Transform's warehouses, completely intermingled with Transform's own inventory.  Until the point when the Debtors actually took possession of a given piece of inventory, Transform treated it as its own.  If, for example, Transform did not have an item in its own inventory to fulfil a sale, it would remove the item from the Debtors' "virtual" inventory, and, in its place, provide a "credit" to the Debtors.  Doing so allowed the Transform entities to maintain lower inventory levels for themselves and still have stock for customers.

123.    As a result of this system, the general ledger is a melting pot of transactions.  It fuses the Debtors' own transactions into those of Transform, and reduces the mixture to an opaque amalgam from which discerning SHS's payments to the Debtors' own ostensible creditors is impossible.  The general ledger reflects only: (a) a single net bulk payment by SHS to Transform on account of the Weekly Invoice (which payments become late and/or short-paid as SHS's condition deteriorated), and (b) bulk payments by Transform to creditors of one, or multiple, Sears creditors.

124.    The Debtors neither calculated nor paid the Dealer Commissions to the Dealers. The Transform Defendants did all of that, using their own software and programs, which they themselves maintained.  Every two weeks, the Transform Defendants would email a particular employee of the Debtors to tell that person the total amount that SAHS then owed to all of the Dealers on account of Dealer Commissions.  Transform – who, as mentioned, had total control

23

over SHS's bank accounts – would then transfer that total amount from the Debtors' bank account to the Transform Defendants' own bank account. At some later time, the Transform Defendants would then pay the Dealer Commissions owed to each Dealer using co-mingled funds. The Transform Defendants would transmit to the Dealers a "commission report" using software that they themselves maintained. The Transform Defendants would also issue Form 1099s to the Dealers. Thus, for all intents and purposes, the Transform Defendants were the ones who paid the Dealers.

125.    In dealings between the Debtors and Transform, the parties did not distinguish between the different Transform Defendants.

126.    For example, all payments on the Weekly Invoices were made to Transform Midco. Transform Midco was not a party to either the Merchandising Agreement or the Services Agreement. On information and belief, no contracts at all existed between the Debtors and Transform Midco.

127.    From the Merger until the Petition Date, the Debtors were chronically under-capitalized as evident by their reliance on the Transition Agreements. In addition, in May 2022, the independent auditor for SHS issued consolidated financial statements for fiscal years ending February 1, 2020, January 30, 2021 and January 29, 2022 showing net operating losses for each fiscal year. The auditor also reported that substantial doubt existed regarding the Debtors' ability to continue operating as a going concern.

### iii.    SHS pays hundreds of millions of dollars to Transform.

128.    The Weekly Invoice included the SHS Accounts Payable, as well as 62 other line items (the "Invoice Line Items") representing charges and credits that the Transform Defendants assessed to the Debtors.

74144707\10

129. To calculate the Weekly Invoice, Transform maintained a detailed spreadsheet that was automatically fed with inputs by Transform's accounting and financial tracking software.

130. On information and belief, the Invoice Line Items included charges and credits that had no basis in the Transition Agreements, including the Gross Margin Allocation (discussed below).

131. The Transform Defendants, not the Debtors, controlled and maintained the spreadsheet and the financial accounting systems that populated the spreadsheet.

132. The Invoice Line Items included the following categories, among others:

a. SHS Accounts Payable. Amounts paid on the Debtors' behalf were charged to the Debtors by Transform as reflected in Transform's account payable account. However, as described above, Transform gave the Debtors just ten days to pay the Weekly Invoice. However, Transform would then wait 30, 45, or even 60 days before making payment to the Debtors' vendors, all the while using the Debtors' cash for its own benefit. To boot, the Debtors paid Transform a regular (separate) fee for these "services."

b. Gross Margin Allocation. The spreadsheet maintained by Transform included a mechanism to allocate the Transform Defendants' gross margins to the Debtors. Margins were determined by the Transform Defendants and applied on a monthly basis via the spreadsheet, and could provide either a credit or expense to the Debtors. Thus, on an accounting basis, the Debtors and the Transform Defendants shared an identity of interests, as the Transform Defendants baked their profits and losses into the Weekly Invoice, thus extending them to the Debtors.

74144707\10

Case 24-50281-BLS    Doc 1    Filed 12/11/24    Page 26 of 52

133.    Each week, Transform would net all of the Invoice Line Items against one another in order to arrive at the total amount of the Weekly Invoice.

134.    On information and belief, many of the shared expenses assessed to the Debtors under the Weekly Invoice system were not set forth in the Transition Agreements or any other contracts between the parties. In its domination of the Debtors, Transform did not view itself as constrained in any way by the scope of the Transition (or any other) Agreements.

135.    Despite the fact that Transform Midco was a party to neither of the Transition Agreements, the Debtors made all of their payments on account of Weekly Invoices to Transform Midco.

### iv.    To third parties, the Debtors presented as a single economic enterprise with Transform.

136.    After the Merger, the Transform Defendants effectively merged their own headquarters with those of the Debtors. Transform moved the Debtors' headquarters into Transform's building – and essentially into Transform's own office space. There was no segregation or locked door that separated the offices of the Transform Defendants from those of the Debtors. By all outward appearances, the two headquarters were but one.

137.    Vendors of the Debtors were under the reasonable impression that they were dealing with Transform.

138.    Transform – not the Debtors – negotiated terms with vendors who were to ultimately supply goods or services to the Debtors. As mentioned, the Debtors were unable to issue their own purchase orders. Instead, Transform would issue the purchase order, and the purchase order would bear Transform's name, not the Debtors.' Some vendors, justifiably unaware that they were actually meant to be a vendor of the Debtors, would then issue their corresponding invoices to Transform.

26

139.   Moreover, the Transform Defendants, not the Debtors, would make payments to the Debtors' vendors.  Vendors would receive a notification that the Transform Defendants – rather than the Debtors – had made the payment, which caused confusion among creditors.  Indeed, on information and belief, the checks that Transform sent to the Debtors' vendors on their behalf listed Transform as the payor, and not the Debtors.

140.   Turning to the point of view of the Debtors' customers, the entities were similarly indistinguishable.  Customers had no reason to believe that they were not dealing simply with "Sears" (i.e., Transform).

141.   The Sears Hometown stores incorporated the iconic blue "Sears" logo as part of their signage.

142.   The "Sears®" logo was printed on the Debtors' customers' receipts.

143.   On information and belief, after the Merger, the Transform Defendants took down the Debtors' own websites, and thereafter, anybody attempting to view the Debtors' websites was automatically transferred to www.Sears.com.

144.   The Transform Defendants maintained a "Sears"-branded credit card program through MasterCard (the "Card Program").  Customers of Sears Hometown stores had the opportunity to sign up for the Card Program, which offered cardholders discounts and special offers at both Sears and Sears Hometown stores.

145.   Under the Card Program, customers could earn rewards by using the Sears- branded cards equally at both Sears Hometown stores and at Sears (i.e., Transform) stores and websites.

146.   Customers could use Sears-branded gift cards at Sears Hometown, sears.com, or the Sears stores.

27

147.    Customers of Sears Hometown stores would regularly receive promotions from www.Sears.com and weblinks to both Sears Hometown and Sears products.

148.    Whenever customers of the Debtors contacted customer service, they were directed to personnel employed by the Transform Defendants, including to the "Sears Holdings Corporation's Delivery Department."  In dealing with customer service over email, customers of the Debtors would receive emails from the email addresses "@customerservice.sears.com" or "@searshc.com." These emails would include a signature block indicating that they were from "Sears Member Services."  The emails included a standard boilerplate stating, "This message, including any attachments, is the property of Transform HoldCo LLC and/or one of its subsidiaries."

149.    If a customer of the Debtors needed to have repairs made to a product that he or she had purchased, those repairs would be performed by Transform Service Centers.

150.    When a customer purchased an item on Sears.com, the sale would be processed either through the Debtors or through the Transform Defendants, depending on the type of product purchased.  From the customer's point of view, he or she would be purchasing the product simply from "Sears."

151.    For example, the Transform Defendants did not have a relationship with Whirlpool, and were themselves unable to sell Whirlpool products.  However, the Debtors *were* able to sell Whirlpool products.  Blurring the distinction between entities, the Transform Defendants would cause the Debtors to procure Whirlpool products, which the Transform Defendants would then sell on the Sears.com website.

74144707\10

152.    On information and belief, if a customer order processed through the Debtors was not delivered and the customer demanded a refund, the customer would be directed to customer service at the Transform Defendants.

153.    Customers of the Debtors have filed almost 200 proofs of claims against the Estates arising from defective or undelivered inventory that they purchased at either sears.com or a Sears Hometown store, and hundreds of other customers likely exist who declined to go through the trouble of filing a proof of claim.

154.    Customers of the Debtors had no reason to believe that they were dealing not with Sears and the Transform Defendants, but instead with a separate, chronically undercapitalized and financially distressed company.

### H.    Transform Loan Agreement

155.    When the parties entered into the PNC Credit Agreement, the amount of the revolving credit facility was $80,000,000.  In January 2022, the amount of the revolving credit facility was reduced to $45,000,000.

156.    Accordingly, the Debtors, as borrowers, entered into a term loan agreement with Transform Acceptance, as lender, dated as of January 26, 2022 (the "Transform Loan Agreement").  The Transform Loan Agreement provided for a $5 million term loan.  The Debtors and Transform Acceptance entered into an Amended and Restated Loan Agreement, dated as of July 20, 2022 (the "Amended Transform Loan Agreement") pursuant to which the principal amount of the loan was increased from $5 million to $15 million.

157.    The Debtors' obligations under the Transform Loan Agreement were secured by a second priority security interest in the same collateral that was subject to PNC's first priority

29

security interest under the PNC Credit Agreement, subject to an Intercreditor Agreement between Transform Acceptance and PNC (the "Alleged Transform Lien").

158.    As of December 9, 2022, the Debtors owed PNC approximately $22.6 million in respect of loans and other financial accommodations made by PNC under the PNC Credit Agreement, approximately $14,000 under the purchasing card facility, and $199,867.00 with respect to the face amount of issued and outstanding letters of credit.

159.    Following the liquidation of PNC's collateral, on information and belief, PNC holds an unsecured claim of approximately $16.5 million.  Thus, PNC was, at all relevant times, grossly undersecured.

**I.    SHS made transfers of at least $177,763,701.05 to the Transform Defendants during the one-year period prior to the Petition Date.**

160.    Beginning December 12, 2021 though the Petition Date (the "One-Year Period"), the Debtors transferred at least $177,763,701.05 to or for the benefit of one or more of the Transform Defendants (the "One-Year Transfers").

161.    Additional detail regarding the One-Year Transfers, including the transferor date and method of each transfer and the ostensible reason for payment, is set forth on Exhibit A, which is incorporated herein by reference.

162.    On information and belief, the Debtors made all of the One-Year Transfers to account No. ending -7734 at PNC Bank (the "-7734 Account") owned by Transform Midco, with the exception of the Utilities and Rent Payments (as defined herein), which the Debtors made to Transform Holdco.

163.    On information and belief, the Debtors made approximately $148,378,725.05 of the One-Year Transfers to or for the benefit of the Transform Defendants ostensibly on account of the Weekly Invoices (the "Weekly Invoice Transfers").

30

74144707\10

164.    The Weekly Invoices were the Debtors' largest payable other than the Dealer Commissions and were a critical source of revenue for Transform.  On information and belief, during the One-Year Period, Transform was experiencing cash flow shortages and exerted pressure on SHS to make the Weekly Invoice Transfers.

165.    On information and belief, the Debtors made approximately $27,492,524.67 of the One-Year Transfers to or for the benefit of the Transform Defendants ostensibly in connection with commissions owed to Dealers (the "Ostensible Dealer Payments").  However, on information and belief, the Transform Defendants, once they had these funds in their possession, intermingled them with other funds, and may have treated these payments simply as "on account" payments made by the Debtors, to be applied as the Transform Defendants saw fit.

166.    On information and belief, the Debtors made approximately $1,379,831.95 of the One-Year Transfers to or for the benefit of the Transform Defendants ostensibly on account of interest and other payments due under the Transform Loan Agreement (the "Transform Loan Payments").

167.    On information and belief, the Debtors made approximately $346,230.12 of the One-Year Transfers to or for the benefit of the Transform Defendants ostensibly on account of separate inventory purchases (the "Inventory Payments," and together with the Weekly Invoice Transfers, the Ostensible Dealer Payments and the Transform Loan Payments, the "Midco Transfers").

168.    On information and belief, the Debtors made approximately $166,389.26 of the One-Year Transfers to or for the benefit of the Transform Defendants ostensibly on account of utilities and rent (the "Utilities and Rent Payments").

74144707\10

169.    During the One-Year Period, BDO USA, LLP ("BDO") performed an audit of SHS's financial statements for each of the fiscal years ending February 1, 2020, January 30, 2021, and January 29, 2022.

170.    BDO found that SHS had incurred net operating losses during those periods in the amounts of $62,821,000, $10,629,000, and $18,321,000, respectively.

171.    BDO found that "substantial doubt" existed about SHS's "ability to continue as a going concern within one year after the date these financial statements are issued," including within the One-Year Period.

## COUNT I – ALTER EGO

### (against Transform Defendants)

172.    The Trustee restates and realleges the allegations in the foregoing paragraphs 1 through 171 herein.

173.    Mr. Lampert, through the Transform Defendants, acquired the Debtors in 2019 pursuant to the Merger as part of a business strategy to defray operating expenses and implement a plan to sell Transform/Sears inventory in small-format stores using the Debtors' nationwide network of Dealers as a channel to sell its inventory.

174.    Mr. Lampert, through the Transform Defendants, sold the profitable Outlet segment, because the Outlet segment was not reliant on purchasing Transform's merchandise, and instead wholly incorporated the chronically struggling Hometown Stores segment and integrated the company into Transform's operations and infrastructure.

175.    Mr. Lampert, through the Transform Defendants, and the Transform Defendants themselves, were on both sides of the Transition Agreements, as both the equity holders of the Debtors and the non-Debtor counterparties thereto.

74144707\10

176.    After the Merger, the Transition Agreements served no purpose other than to provide cover for the Transform Defendants to take hundreds of millions of dollars in capital from the chronically struggling and undercapitalized Debtors.

177.    The Debtors and the Transform Defendants were not operating at arm's length.  The Transform Defendants sold the Debtors' Independent ERP at the same time as the Merger, leaving the Debtors wholly and utterly dependent on Transform.

178.    If Transform stopped providing services or inventory, the Debtors' operations would immediately cease.  There was no credible possibility that the Debtors would take their business elsewhere.

179.    As outlined above, the Transform Defendants performed virtually all of the back-office services for the Debtors, provided the infrastructure necessary for the Debtors to perform their business, relocated the company to the same offices, and shared key employees and officers.

180.    The strategy allowed Transform to isolate liabilities within the Debtors (including the PNC Claim, tax liabilities and the Dealer Commissions) while simultaneously extracting benefits like low-cost inventory, infrastructure financing, substantial cash flow on favorable terms, and a captive sales channel for its inventory, including the KCD Products.

181.    As outlined above, at all relevant times from the Merger through the Petition Date (the "Post-Merger Period"), Transform dominated and effectively controlled the Debtors' operations for its own benefit.

182.    As outlined above, throughout the Post-Merger Period, the Debtors and Transform operated their businesses as a single economic entity.

74144707\10

183.    The Debtors' undercapitalization during the Post-Merger Period was evident by their dependence upon the Transform Defendants for financial and operational support in order for the Debtors to conduct their business operations.

184.    At all relevant times during the Post-Merger Period, the Debtors were insolvent.

185.    During the Post-Merger Period, the Debtors neither recognized nor paid any dividends to their shareholders.

186.    The Debtors' bankruptcy estates have insufficient funds to satisfy the claims of the Debtors' creditors.

187.    The Debtors failed to recognize corporate formalities.

188.    Due to the Transform Defendants' domination and control over the Debtors' operations for the benefit of the Transform Defendants during the Post-Merger Period, the recognition of corporate separateness between the Debtors and the Transform Defendants would be unfair and would promote an injustice to the Debtors' creditors.

189.    The Transform Defendants should therefore be (i) treated as the alter egos of the Debtors and (ii) thereby held liable for the payment of all prepetition claims against the Debtors.

WHEREFORE, for this Count I, the Trustee requests entry of a judgment against the Transform Defendants (i) finding that the Transform Defendants are the alter egos of the Debtors, (ii) holding the Transform Defendants liable for the prepetition claims of the Debtors, and (iii) granting all such other just and equitable relief.

34

## COUNT II – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

### Avoidance of One-Year Transfers – 11 U.S.C. § 548

### (against Transform Contract Parties, Transform Midco and Transform Holdco)

190.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 189 herein.

191.    Pursuant to section 548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

192.    Transform Midco and Transform Holdco received the One-Year Transfers.

193.    Each of the One-Year Transfers was a "transfer" within the meaning of section 101(54) of the Bankruptcy Code.

194.    The Transition Agreements were initially entered into in connection with the Spin-off of SHS from its previous owner, Sears Holdings.

195.    By design, the Transition Agreements required the provision of services that had previously been provided to the Debtors by their parent company, Sears Holdings.

196. The Transition Agreements were intended to be temporary in nature while the Debtors stabilized after the Spin-off as an independently owned company.

197. The obligations owed by the Debtors under the Transition Agreements do not bear interest.

198. The obligations under the Transition Agreements are unsecured.

199. After the Spin-off, Transform purchased substantially all of the operating assets from the Sears Holdings Bankruptcy Case and took assignment of the Transition Agreements. Less than a year later, the Transform Defendants merged with the Debtor SHS pursuant to the Merger and obtained a substantial controlling majority of Debtor SHS's equity.

200. The Transform Defendants caused SHS to sell the Independent ERP to the Franchise Group, developed at a cost of over $40 million, which would have otherwise allowed SHS to remain independent and reduce or eliminate its reliance on the Transform Defendants under the Transition Agreements.

201. The Transition Agreements were not terminated as initially contemplated but rather were extended, and the services provided thereunder expanded.

202. After the Merger, the services and merchandise provided under the Transition Agreements were effectively capital contributions. Therefore, the One-Year Transfers were repayments of capital.

203. Likewise, any value extended by Transform pursuant to the Transform Loan Agreement was a capital contribution.

204. To the extent that the One-Year Transfers were on account of the Transform Loan Agreement, they were repayments of capital contributions to the Transform Contract Parties, Transform Midco and Transform Holdco.

74144707\10

205. As more particularly set forth above, the One-Year Transfers were made at a time when: (i) the Debtors were insolvent or rendered insolvent as a result of the One-Year Transfers, (ii) the Debtors had unreasonably small capital, and/or (iii) the Debtors had incurred or intended to incur debts that they would not be able to pay as they became due.

206. The One-Year Transfers are thus avoidable pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and the value of the One-Year Transfers is recoverable by the Trustee pursuant to section 550 of the Bankruptcy Code.

WHEREFORE, for this Count II, the Trustee requests entry of a judgment against the Transform Contract Parties, Transform Midco and Transform Holdco (i) avoiding the One-Year Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code in the amount of $177,763,701.05, (ii) recovering the value of the One-Year Transfers from the Transform Contract Parties, Transform Midco, and Transform Holdco pursuant to section 550 of the Bankruptcy Code; and (iii) granting all such other just and equitable relief.

**COUNT III – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**

**Avoidance of One-Year Transfers – 11 U.S.C. § 544; Del. Code. tit. 6 § 1305(a)**

**(against Transform Contract Parties, Transform Midco and Transform Holdco)**

207. Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 206 herein.

208. Pursuant to section 1305(a) of Title 6 of the Delaware Code, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:  a. Was engaged or was about to engage in a business or

a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

209.    Transform Midco and Transform Holdco received the One-Year Transfers.

210.    Each of the One-Year Transfers was a "transfer" within the meaning of 6 Del. Code § 1301(12) and section 101(54) of the Bankruptcy Code.

211.    Each of the One-Year Transfers was a transfer of property, or of an interest in property, of the Debtor to and/or for the benefit of the Transform Contract Parties, Transform Midco and Transform Holdco.

212.    The Debtors thus received no reasonably equivalent value for the One-Year Transfers.  As described herein, the One-Year Transfers were effectively repayments of capital to the Transform Contract Parties, Transform Midco and Transform Holdco.

213.    Each of the One-Year Transfers was made a time when the Debtor was insolvent or was rendered insolvent by such transfer.

214.    At all times relevant hereto, the Debtor had at least one general unsecured creditor holding an allowable claim who, but for the bankruptcy filing, would have standing to bring claims to avoid and recover the One-Year Transfers.

215.    The One-Year Transfers are thus avoidable pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305.

WHEREFORE, for this Count III, the Trustee requests entry of a judgment against the Transform Contract Parties, Transform Midco and Transform Holdco (i) avoiding the One-Year Transfers pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305, in the amount of $177,763,701.05, (ii) recovering the value

38

74144707\10

of the One-Year Transfers from the Transform Contract Parties, Transform Midco and Transform Holdco pursuant to section 550 of the Bankruptcy Code in the amount of $177,763,701.05; and (iii) granting all such other just and equitable relief.

## COUNT IV – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

### Avoidance of One-Year Transfers – 11 U.S.C. § 548

### (against Transform Midco)

216. Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 215 herein.

217. SHS made the Midco Transfers to Transform Midco during the One-Year Period in the amount of $177,597,311.79, including without limitation the Ostensible Dealer Payments in the amount of $27,492,524.67.

218. SHS did not receive reasonably equivalent value with respect to the Midco Transfers.

219. Transform Midco was not a party to any agreement with the Debtors and provided no goods or services, or value at all, to the Debtors in return for the Midco Transfers.

220. Additionally, SHS was not a party to the Dealer Agreements and had no obligation to pay Commissions to the Dealers.

221. SHS therefore did not receive reasonably equivalent value with respect to the Ostensible Dealer Payments.

222. As more particularly set forth above, the Midco Transfers were made at a time when: (i) the Debtors were insolvent or rendered insolvent as a result of the Midco Transfers, (ii) the Debtors had unreasonably small capital, and/or (iii) the Debtors had incurred or intended to incur debts that they would not be able to pay as they became due.

39

74144707\10

223. The Midco Transfers are thus avoidable pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Midco Transfers is recoverable by the Trustee pursuant to section 550 of the Bankruptcy Code.

WHEREFORE, for this Count IV, the Trustee requests entry of a judgment against Transform Midco (i) avoiding the Midco Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code in the amount of $177,597,311.79, (ii) recovering the value of the Midco Transfers from Transform Midco pursuant to section 550 of the Bankruptcy Code in the amount of $177,597,311.79; and (iii) granting all such other just and equitable relief.

## COUNT V – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

### Avoidance of One-Year Transfers – 11 U.S.C. § 544; Del. Code. tit. 6 § 1305(a)

### (against Transform Midco)

224. Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 223 herein.

225. SHS made the Midco Transfers to Transform Midco during the One-Year Period in the amount of $177,597,311.79, including without limitation the Ostensible Dealer Payments in the amount of $27,492,524.67.

226. SHS did not receive reasonably equivalent value with respect to the Midco Transfers.

227. Transform Midco was not a party to any agreement with the Debtors and provided no goods or services, or value at all, to SHS in return for the One-Year Transfers.

228. Additionally, SHS was not a party to the Dealer Agreements and had no obligation to pay Commissions to the Dealers.

74144707\10

229.    SHS therefore did not receive reasonably equivalent value with respect to the Ostensible Dealer Payments.

230.    As more particularly set forth above, the Midco Transfers were made at a time when: (i) the Debtors were insolvent or rendered insolvent as a result of the Midco Transfers, (ii) the Debtors had unreasonably small capital, and/or (iii) the Debtors had incurred or intended to incur debts that they would not be able to pay as they became due.

231.    The Midco Transfers are thus avoidable pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305(a).

WHEREFORE, for this Count V, the Trustee requests entry of a judgment against Transform Midco (i) avoiding the Midco Transfers pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305(a), in the amount of $177,597,311.79, (ii) recovering the value of the Midco Transfers from Transform Midco pursuant to section 550 of the Bankruptcy Code in the amount of $177,597,311.79; and (iii) granting all such other just and equitable relief.

**COUNT VI – AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS**

**Avoidance of One-Year Transfers – 11 U.S.C. § 547**

**(against Transform Contract Parties, Transform Midco and Transform Holdco)**

*(Pled in the Alternative to Counts II, III, IV, and V)*

232.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 231 herein.

233.    Pursuant to 11 U.S.C. § 547(b), a trustee, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses may avoid any transfer of an interest of the debtor in property: (a) to or for

41

the benefit of a creditor; (b) for or on account of an antecedent debt owed by the debtor before such transfer was made; (c) made while the debtor was insolvent; (d) made on or within ninety (90) days, or in certain circumstances within one year of the filing of the petition, or between ninety (90) days and one year before the filing of the petition if such creditor at the time of such transfer was an insider; and (e) that enables such creditor to receive more in satisfaction of its claims than it would receive in a case under chapter 7 of the Bankruptcy Code if the transfer had not been made.

234.    During the One-Year Period, SHS made the One-Year Transfers to or for the benefit of one or more of the Transform Contract Parties, Transform Midco and Transform Holdco in the amount of $177,763,701.05.

235.    The One-Year Transfers were transfers of an interest of the Debtors in property.

236.    The Transform Contract Parties were creditors of the Debtors at the time of the One-Year Transfers.[2]

237.    The One-Year Transfers were for or on account of an antecedent debt owed by one or more of the Debtors.

238.    The Transform Contract Parties, Transform Midco and Transform Holdco are insiders of the Debtors.

---

[2] Various Transform entities filed proofs of claim Nos. 93 and 94.  Each proof of claim was signed under penalty of perjury by Luke Valentino as general counsel for Transform.  In doing so, Mr. Valentino became a fact witness and waived attorney-client and work product privileges on behalf of Transform with respect to Transform's claims in the Bankruptcy Cases.  *See*, *e.g.*, *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at \*4 (Bankr. S.D. Tex. June 5, 2013) (holding that petitioning creditors waived attorney-client and work product privileges when their attorney signed their proof of claim, holding that "by signing proof of claim," the attorney "became a fact witness to the allegations contained in the proof of claim," and compelling attorney to testify as to otherwise privileged communications, answer interrogatories, and sit for deposition).  *See also In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (Bankr. D. Del. November 29, 2021), Transcript of Hearing, pp.87-92 ("I conclude that when an attorney decides to sign a proof of claim for his client, he makes himself subject to discovery in this court, with respect to all aspects of the proof of claim.").  The Trustee reserves all rights to seek discovery from, and to depose, Mr. Valentino regarding any and/or all aspects of Transform's claims in the Bankruptcy Cases.

74144707\10

239.    The Debtors were insolvent during the One-Year Period.  At the time that each of the One-Year Transfers was made, the sum of the debts of the Debtor making the One-Transfers exceeded the total value of such Debtor's property at a fair valuation. The Debtors are presumed to have been insolvent between the period of September 13, 2022 and the Petition Date pursuant to 11 U.S.C. § 547(f).

240.    The One-Year Transfers permitted the Transform Contract Parties, Transform Midco and Transform Holdco to receive more in satisfaction of their claims against the Debtors than they would have received in a case under chapter 7 of the Bankruptcy Code had the payment not been made.

241.    By reason of the foregoing, Plaintiff is entitled to an order and judgment under 11 U.S.C. § 547 avoiding the One-Year Transfers.

WHEREFORE, for this Count VI, the Trustee requests entry of a judgment against the Transform Contract Parties, Transform Midco and Transform Holdco (i) avoiding the One-Year Transfers pursuant to section 547(b) of the Bankruptcy Code in the amount of $177,763,701.05, (ii) recovering the value of the One-Year Transfers from Transform Midco, Transform Midco and Transform Holdco pursuant to section 550 of the Bankruptcy Code in the amount of $177,763,701.05; and (iii) granting all such other relief as this Court determines is just and equitable relief.

74144707\10

## COUNT VII – AVOIDANCE AND RECOVERY OF
## INSIDER PREFERENTIAL TRANSFERS

**Avoidance of One-Year Transfers – 11 U.S.C. § 544; 6 Del. tit. § 1305(b)**

**(against Transform Contract Parties, Transform Midco and Transform Holdco)**

*(Pled in the Alternative to Counts II, III, IV, and V)*

242. Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 241.

243. Pursuant to section 1305(b) of Title 6 of the Delaware Code, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

244. Transform Midco and Transform Holdco received the One-Year Transfers.

245. The One-Year Transfers were made on account of the Transition Agreements or the Transform Loan Agreement.

246. Each of the One-Year Transfers was a "transfer" within the meaning of 6 Del. Code § 1301(12) and section 101(54) of the Bankruptcy Code.

247. Each of the One-Year Transfers was a transfer of property, or of an interest in property, of the Debtors to one or more of the Transform Contract Parties, Transform Midco and Transform Holdco.

248. The One-Year Transfers were for or on account of an antecedent debt.

249. Each of the One-Year Transfers was made a time when the Debtors were insolvent or was rendered insolvent by such transfer.

74144707\10

250.    Transform had reasonable cause to believe that the Debtors were insolvent.  At the time of the One-Year Transfers, Transform had access to – and knowledge of – all of the Debtors' financial and accounting records.

251.    The One-Year Transfers are thus avoidable pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305(b).

WHEREFORE, for this Count VII, the Trustee requests entry of a judgment against the Transform Contract Parties, Transform Midco and Transform Holdco (i) avoiding the One-Year Transfers pursuant to section 544 of the Bankruptcy Code and applicable state law, including without limitation 6 Del. Code § 1305(a), in the amount of $177,763,701.05, (ii) recovering the value of the One-Year Transfers from the Transform Contract Parties, Transform Midco and Transform Holdco pursuant to section 550 of the Bankruptcy Code in the amount of $177,763,701.05; and (iii) granting all such other just and equitable relief.

## COUNT VIII – OBJECTION TO CLAIMS

### (against Transform Contract Parties and Transform Midco)

252.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 251 herein.

253.    The Transform Contract Parties, Transform Midco and Transform Holdco are transferees of transfers that are avoidable pursuant to sections 544, 547 or 548 of the Bankruptcy Code, which property is recoverable pursuant to section 550 of the Bankruptcy Code.

254.    Neither the Transform Contract Parties, Transform Midco nor Transform Holdco have paid the amount of the avoidable transfers, or turned over such property, for which they are liable under section 550 of the Bankruptcy Code.

74144707\10

255.    Pursuant to section 502(d), any and all claims of the Transform Contract Parties, Transform Midco, Transform Holdco and/or their assignees against the Estates must be disallowed until such time as such parties pay to the Trustee an amount equal to the aggregate amount of the One-Year Transfers, plus interest thereon and costs.

WHEREFORE, for this Count VIII, the Trustee requests entry of a judgment against the Transform Contract Parties, Transform Midco and Transform Holdco disallowing any claims held by such parties against the Estates until such parties return the One-Year Transfers to the Trustee pursuant to 11 U.S.C. §§ 502(d) and (j).

## COUNT IX – RECHARACTERIZATION OF CLAIMS AS EQUITY

### (against Transform Contract Parties)

256.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 255 herein.

257.    On May 3, 2023, Transform SR, Transform KM, and Transform SR Holding Management filed Claim No. 94-1 [SAHS Claims register] against the Debtors in the amount of $17,441,070.10 representing amounts ostensibly owed under the Transition Agreements (the "Agreements Claim").

258.    Also on May 3, 2023, Transform Acceptance filed a  Claim No. 93-1 [SAHS Claims register] (the "Loan Agreement Claim," and with the Agreements Claim, the "Transform Claims") in the amount of $15,367,273.05 against the Debtors for the amount of $17,441,070.10 representing amounts allegedly owed under the Transform Loan Agreement.

259.    Any services and merchandise provided by the Contract Parties under the Transition Agreements were capital contributions to the Debtors.

46

260. Any value provided by the Contract Parties under the Transform Loan Agreement was a capital contribution.

261. Accordingly, the Transform Claims should be recharacterized as equity, not as a claim paid on par with creditors holding valid claims against the Estates.

WHEREFORE, for this Count IX, the Trustee requests entry of a judgment against the Transform Contract Parties (i) recharacterizing the Transform Claims as equity and (ii) disallowing the Transform Claims.

## COUNT X – BREACH OF FIDUCIARY DUTY OF CARE

### (against the Fiduciary Defendants)

262. Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 261 herein.

263. At all relevant times, Mr. Lampert controlled and directed all of the Transform Defendants and the Debtors by virtue of his direct and indirect ownership interest in all entities.

264. On information and belief, Mr. Lampert and ESLP appointed Ms. Robertson as CEO of Debtor SHS in May 2022.

265. On information and belief, Mr. Lampert and ESLP appointed Ms. Robertson as director of Debtor SHS in October 2022.

266. On information and belief, Mr. Lampert and ESLP appointed Mr. Basra to serve as chief financial officer ("CFO") of both of the Debtors from June 2022 through November 2022.

267. On information and belief, Mr. Lampert and ESLP appointed Mr. Rafeeq to serve as CFO of both of the Debtors from approximately July 2020 through May 2022.

268. As noted above, on information and belief, Ms. Robertson, Mr. Barsra and Mr. Rafeeq held positions at Transform while also maintaining positions at the Debtors.

269. As noted above, Mr. Lampert controlled all of the equity interests of the Debtors while simultaneously controlling Transform.

270. The Fiduciary Defendants were responsible for making all of SHS's key financial decisions during the relevant time period, including without limitation, paying the One-Year Transfers and allowing Transform to dominate and control the Debtors, as outlined above.

271. Given their active management and control over the Debtors and their affairs while they were insolvent, the Fiduciary Defendants also had a fiduciary duty to the Debtors' creditors to act with good faith, with due care, and for the common good of the Debtors' creditors.

272. It is evident from the allegations herein that, at all relevant times, the Fiduciary Defendants repeatedly and deliberately elevated the interests of Transform over the interests of the Debtors' creditors.

273. In doing so, the Fiduciary Defendants shifted significant value away from creditors and into the hands of Transform, all while their fiduciary duties should have dictated otherwise.

274. On information and belief, in breach of their duties, the Fiduciary Defendants also acted improperly by, among other things:

   a. Permitting performance under the Services Agreement that was not the result of fair dealing;

   b. Permitting performance under the Merchandising Agreement that was not the result of fair dealing;

   c. Failing to be active monitors of the Debtors' corporate performance and of the effects of the Transition Agreements on the Debtors; and

   d. Failing to maximize the economic value of the Debtors.

74144707\10

275.    Along the way, the Fiduciary Defendants repeatedly ignored corporate formalities and never undertook to introduce any semblance of disinterestedness into their blatantly conflicted decision-making apparatus.

276.    As a direct result of these actions: (i) the Debtors paid over $170 million to Transform during the One-Year Period, thus losing the benefit of those revenues, and (ii) the Debtors' assets were caused to be wasted, improperly diminishing valuable property of the Debtors' bankruptcy estate.

277.    As fiduciaries, the Fiduciary Defendants were also bound to: (a) conduct the affairs of the Debtors without fraud or mismanagement; (b) properly oversee and account for the Debtors' assets; and (c) perform their duties for the benefit of the Debtors.

278.    In breach of their duties, the Fiduciary Defendants conducted the affairs of the Debtors for the benefit of Transform, rather than the benefit of the Debtors.

279.    The series of self-dealing transactions approved by the Fiduciary Defendants remove them from the protections, if any, of the business judgment rule.

WHEREFORE, for this Count X, the Trustee requests entry of a judgment against the Fiduciary Defendants for damages in the amount of the One-Year Transfers and all such other just and equitable relief.

## COUNT XI – BREACH OF FIDUCIARY DUTY OF LOYALTY

### (Against the Fiduciary Defendants)

280.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 279 herein.

281.    The Fiduciary Defendants each had a fiduciary duty of undivided loyalty to the Debtors.

49

74144707\10

282.    In breach of their fiduciary duty of undivided loyalty to the Debtors, and as set forth more fully herein, the Fiduciary Defendants improperly acted for their own benefit and/or for the benefit of Transform, by, among other things:

    a.  Paying the One-Year Transfers and allowing Transform to dominate and control the Debtors, as outlined above;

    b.  Permitting performance under the Services Agreement that was not the result of fair dealing;

    c.  Permitting performance under the Merchandising Agreement that was not the result of fair dealing;

    d.  Failing to be active monitors of the Debtors' corporate performance and of the effects of the Transition Agreements on the Debtors; and

    e.  Failing to maximize the economic value of the Debtors.

283.    It is evident from the allegations herein that, at all relevant times, the Fiduciary Defendants repeatedly and deliberately elevate their own interests and the interests of Transform over the interests of the Debtors' creditors.

WHEREFORE, for this Count XI, the Trustee requests entry of a judgment against the Fiduciary Defendants for damages in the amount of the One-Year Transfers and all such other just and equitable relief.

### COUNT XII – SUBSTANTIVE CONSOLIDATION

**(against Transform Defendants)**

284.    Plaintiff restates and realleges the allegations in the foregoing paragraphs 1 through 283 herein.

50

74144707\10

51

285.    At all relevant times during the Post-Merger Period, the Debtors and the Transform Defendants disregarded their separateness from each other as distinct corporate entities.

286.    As a result of the disregard for corporate separateness that the Debtors and the Transform Defendants demonstrated, their creditors dealt with the Debtors and the Transform Defendants as a single economic unit and did not rely upon their separate identities when extending credit to them.

287.    The Debtors and the Transform Defendants disregarded corporate separateness so significantly that their creditors relied upon the breakdown of entity borders and treated the Debtors and the Transform Defendants as one indistinguishable entity.

288.    The assets and liabilities of the Debtors and the Transform Defendants should therefore be substantively consolidated.

*-intentionally blank-*

74144707\10

WHEREFORE, for this Count XII, the Trustee requests entry of a judgment against the Transform Defendants (i) substantively consolidating the assets and liabilities of the Transform Defendants with those of the Debtors, and (iii) granting all such other just and equitable relief.

Dated:  December 11, 2024

COZEN O'CONNOR

/s/ Mark E. Felger

Mark E. Felger (DE No. 3919)
Barry M. Klayman (DE No. 3676)
Simon E. Fraser (DE No. 5335)
Hugh Marbury (DE No. 7427)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801-1147
Telephone (302) 295-2000
Facsimile (302) 295-2013
mfelger@cozen.com
bklayman@cozen.com
sfraser@cozen.com
hmarbury@cozen.com

Peter J. Roberts (IL ARDC 6239025)
David R. Doyle (IL ARDC 6303215)
(Admitted in IL/Not admitted in DE)
123 N. Wacker Drive Suite 1800
Chicago, IL  60606
Telephone (312) 474-1648
Facsimile (312) 382-8910
proberts@cozen.com
daviddoyle@cozen.com

*Counsel to the Trustee*

52

74144707\10